IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| QUANDEL CONSTRUCTION, GROUP, INC. | : | |
| | : | |
| Plaintiff, | : | Case No. 2:24-cv-2362 |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| HUNT CONSTRUCTION GROUP, INC., | : | Magistrate Judge Elizabeth P. Deavers |
| | : | |
| Defendant. | : | |

**OPINION & ORDER**

This matter comes before this Court on Defendant Hunt Construction Group's Motion to Compel Arbitration (ECF No. 17) and Motion to Stay Discovery (ECF No. 24). For the reasons set forth below, this Court **GRANTS** the motions. (ECF Nos. 17, 24).

## I. BACKGROUND

### A. Factual Background

On September 30, 2013, the Parties entered into a Joint Venture Agreement (the "JV Agreement"), forming "QuandelHunt, a Joint Venture (the "Joint Venture"). [Complaint, DE 2-1.] The Joint Venture served as the construction manager for Phase II of the Mount Carmel Grove City Hospital in Grove City, Ohio (the "Project').

In 2013, Quandel and Hunt executed a Joint Venture Agreement thereby forming a joint venture under Ohio law (the "Quandel Hunt Joint Venture" or "QHJV"). (ECF No. 2 ¶ 7; ECF No. 2-1 at 1). The purpose of the QHJV was to prepare and submit a joint proposal to serve as the construction manager under a contract to be awarded by Mount Carmel in connection with the construction of Grove City Phase II (the "Project"). (ECF No. 2 ¶ 8). Under the Joint Venture Agreement, all material decisions were to be made by a management committee, consisting of one

1

representative for each of Hunt and Quandel (the "Management Committee"). (*Id.* ¶ 9). Under the terms of the Joint Venture Agreement, Hunt controlled 50% of the authorized votes in the Management Committee and Quandel controlled the remaining 50%. (*Id.* ¶ 10).

QHJV was successful bidding on the Project and, on July 1, 2013, signed a contract (the "Contract") to act as construction manager for the Project. (*Id.* ¶ 11). Under the Contract, any party seeking additional compensation or time in the schedule must provide timely notice of the claim to QHJV as a condition precedent to receive such additional compensation or time. (*Id.* ¶ 29). On September 9, 2016, Hunt unilaterally signed an amendment to the Contract (the "Amendment"), without Quandel's signature and consent, that purports to waive any requirements for notice of claims under the Contract. (*Id.* ¶ 30). The Project then began to encounter Owner-caused delays, and pursuant to the Amendment, Hunt made the decision not to provide concurrent notice to the Owner. (*Id.* ¶ 32). In response to Owner-caused delays, rather than requesting the Owner agree to additional time and compensation, Hunt's project management team decided to use the contingency in the Contract, causing QHJV to incur these costs without Quandel's knowledge or input. (*Id.* ¶¶ 36-37). At some point, prior to August of 2018, Hunt knew that the Project would not be substantially complete by August 6, 2018, but did not notify Mount Carmel or Quandel. (*Id.* ¶ 39).

In early 2019, Hunt began to receive correspondence from Mount Carmel and various subcontractors alleging claims against QHJV, but Hunt did not immediately share those claims and correspondence with Quandel. (*Id.* ¶ 59). Without Quandel's input or consent, and over its objection, Hunt engaged in an effort to resolve these claims against QHJV. (*Id.* ¶ 62). As the Project drew to completion in the Spring of 2019, Quandel informed Hunt that Hunt was contractually obligated to defend and indemnify Quandel from any claim that was ultimately

2

asserted by the Owner or any subcontractor. (*Id.* ¶ 68). On April 23, 2019, Quandel sent an indemnification demand to Hunt, demanding that Hunt step forward and defend and indemnify Quandel from all the impending claims from the Owner and the Subcontractors on the Project. (*Id.* ¶ 69). Notwithstanding Hunt's original refusal to indemnify Quandel, on or about May 16, 2019, Hunt engaged in defending and indemnifying Quandel. (*Id.* ¶ 72). Hunt paid all attorney fees for the representation of QHJV; negotiated settlements with some subcontractors; and ultimately succeeded in negotiating settlements with the Owner and all subcontractors in the 2019 and 2020 timeframe, paying all of those settlements in full. (*Id.* ¶¶ 73–78).

On January 11, 2024, Hunt issued a "Capital call" through the QHJV, demanding that Quandel pay approximately $6.7 million to the QHJV. (*Id.*). Quandel rejected the Capital Call as improper and filed a demand for arbitration with the American Arbitration Association ("AAA"). (*Id.* ¶¶ 89-90). The AAA issued a letter to Quandel and Hunt asking it to acknowledge their agreement to arbitrate the dispute, which Hunt did not sign. (*Id.* ¶¶ 92-93).

### B. Procedural History

On March 19, 2024, Quandel filed a petition to enforce the arbitration agreement in the Franklin County Court of Common Pleas. (*Id.* ¶ 94). On April 22, 2024, Hunt removed the arbitration petition to the Southern District of Ohio and opposed Quandel's petition. (*Id.* ¶ 95; *see Quandel Construction Grp., Inc. v. Hunt Construction Grp., Inc.*, No. 2:24-cv-1899 [hereinafter "*Qaundel I*" or "*QI*"], ECF Nos. 1–2, 5 (S.D. Ohio, filed March 19, 2024)). On May 10, 2024, Quandel filed a reply in which it agreed that the arbitration provision was invalidated. (*Quandel I*, ECF No. 8).

That same day, Quandel separately initiated this action against Hunt, *Quandel Construction Grp., Inc. v. Hunt Construction Grp., Inc.*, No. 2:24-cv-02362 [hereinafter "*Quandel II*" or "*QII*"], ECF No. 2 (S.D. Ohio, filed May 10, 2024). In this action, Quandel seeks a declaratory judgment

3

that Hunt is required to defend and indemnify Quandel from any losses due to Hunt's management of the QHJV, and damages for breach of fiduciary duty, breach of contract, and theft under Ohio Revised Code § 2307.60, *et seq*. (ECF No. 2).

On July 15, 2024, Hunt filed a motion to compel arbitration and stay proceedings. (ECF No. 17).[1] On July 30, 2024, Hunt moved to stay discovery pending this Court's ruling on the Motion to Compel Arbitration. (ECF No. 24). In August 2024, Quandel opposed both motions (ECF Nos. 26–28), and Hunt replied (ECF No. 29). This matter is now ripe for resolution.

## II. STANDARD OF REVIEW

Under the Federal Arbitration Act ("FAA"), arbitration contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a party who signed an arbitration contract fails or refuses to arbitrate, then the aggrieved party may petition the court for an order directing the parties to proceed in arbitration in accordance with the terms of the arbitration agreement. 9 U.S.C. § 4.

In considering a motion to compel arbitration, the court must determine: (1) whether the parties agreed to arbitrate; and if agreement, (2) the scope of that agreement. *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). If the court is satisfied that the agreement to arbitrate is not "in issue," then it must compel arbitration. 9 U.S.C. § 4; *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010); *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005). If the validity of the arbitration agreement is "in issue," however, then the court must proceed to a trial to resolve the question. 9 U.S.C. § 4.

In order to show that the validity of an arbitration agreement is "in issue," the party

---

[1] That same day, Hunt filed a Notice in *Quandel I* withdrawing its opposition to arbitration. (*Quandel I*, ECF No. 18). Quandel moved to strike the Notice, which Magistrate Judge Deavers denied. (*Quandel I*, ECF Nos. 19, 20).

opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate, which mirrors the standard required to withstand summary judgment in a civil suit. *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (citations omitted). The court is instructed, though, to examine the language of the contract "in light of the strong federal policy in favor of arbitration." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citing *Mitsbuishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). Accordingly, "any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id*.

### III. LAW & ANALYSIS

#### A. Motion to Compel Arbitration

The only challenge Quandel lodges in its opposition to Hunt's motion to compel arbitration, and the main issue before this Court, is whether Hunt's opposition to Quandel's petition to arbitrate in *Quandel I* waived its contractual right to arbitrate the claims in this action.

The Supreme Court recently abrogated the test for determining whether a party has waived its arbitration rights. *See Schwebke v. United Wholesale Mortg.*, 96 F.4th 971, 973 (6th Cir. 2024) (citing *Morgan v. Sundance*, 596 U.S. 411, 414 (2022)). Before *Morgan*, the Sixth Circuit held that a party waives an agreement to arbitrate when it both "(1) tak[es] actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) delay[s] its assertion to such an extent that the opposing party incurs actual prejudice." *Id.* (*citing Hurley v. Deutsche Bank Tr. Co. Americas*, 610 F.3d 334, 338 (6th Cir. 2010)). *Morgan*, however, "eliminated the prejudice requirement." *Id.* at 974.

Accordingly, the Sixth Circuit's waiver test now only asks "whether a party's actions are 'completely inconsistent' with reliance on arbitration . . . ." Schwebke, 96 F.4th at 974–75. In deciding whether a party's actions were "completely inconsistent" with arbitration, the Sixth

Circuit has considered several factors including: (1) how long the party waited before moving to compel arbitration; (2) whether the party raised arbitration as an affirmative defense; (3) whether the party raised other affirmative defenses; (4) whether the party engaged in a discovery conference; (5) whether the party filed a joint discovery plan; and (6) whether the party engaged in discovery. *Id*. at 975. Nonetheless, there is no "bright-line rule" guiding this inquiry, and "the waiver analysis rests on the totality of the circumstances." *Id*. at 976.

Hunt argues that it has not waived its right to arbitrate because it moved to compel arbitration "at the outset of the case." (ECF No. 17 at 6–7). According to Hunt, it "has not even filed an answer to Quandel's complaint, or a counterclaim"; "has not filed any substantive motions"; and "neither party has conducted any discovery." (*Id.*). Quandel responds that Hunt's resistance to arbitration in *Quandel I* and before the AAA are "completely inconsistent with arbitration." (ECF No. 26 at 11–13). Specifically, Quandel notes that Hunt engaged in multiple acts that are "completely inconsistent" with its right to arbitrate, including: (1) refusing to sign the February 2024 AAA letter seeking authorization for the AAA to administer the arbitration; (2) representing to the mediator that it is "not agreeing to arbitrability"; and (3) opposing the Petition to Arbitrate in *Quandel I,* in which Hunt argued that the Arbitration Agreement is unenforceable against "Quandel Construction" because Quandel Construction was not a proper party, and stated that "if mediation between the parties is unsuccessful . . . Hunt intends to file an action against Quandel for sums significantly greater than what Quandel now seeks." (ECF No. 26 at 11–13) (citing *Quandel I,* ECF No. 5 at 3–5)).

In the Sixth Circuit, "conduct inconsistent with reliance on an arbitration agreement" can "waive[] a defendant's ability to seek an arbitration referral ." *JPD, Inc., v. Chronimed Holdings, Inc.*, 539 F.3d 388, 393 (6th Cir. 2008) (internal quotations omitted). But contrary to Quandel's

6

framing of Hunt's opposition to its initial petition to arbitrate, this Court does not read Hunt's arguments as a "categorical" rejection of arbitrability such that it waived its agreement to arbitrate. First, Hunt persuasively shows that it did not "refuse" to sign the AAA letter, as its opposition to the Petition made clear. (*See Quandel I,* ECF No. 5 at 3; *see also Quandel I,* ECF No. 1-3 at 233; *Quandel II,* 26-10 at 2 ("As the AAA did not receive submissions from *either party*, the [AAA] has determined it does not have the authority to continue administration on this matter.") (emphasis added)).

As to its representations to the mediator, Hunt notes that it represented its willingness to arbitrate, as long as the proper Quandel entities were parties to the arbitration. (ECF No. 29 at 3). This is consistent with the arguments Hunt advanced in its petition opposing arbitration. (*See* ECF No. 5 at 5 ("It would obviously be unfair for Quandel to proceed as Quandel Construction, Inc. on its smaller case against Hunt, but then claim that Quandel Construction, Inc. does not exist in the event that Hunt obtains a judgment on its much larger counterclaim.")). Finally, Hunt's opposition to the Petition in *Quandel I* likewise made clear that "[u]ntil Quandel reverses its stance and agrees to mediate with Hunt, any arbitration is premature." (*Id.* at 7). Since Hunt filed the opposition, however, "Quandel [] agreed to mediate, and the parties conducted that mediation on June 27[, 2024]." (ECF No. 17 at 6).

Based on the totality of circumstances, this Court concludes that Hunt's actions were not "completely inconsistent" with its later reliance on the arbitration agreement, given that its objections to arbitration were qualified and limited to the particular deficiencies it observed at the time, e.g., mediation and proper party. *See, e.g.*, *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 484 (5th Cir. 2002) (explaining that "Connecticut General did not initiate any litigation action in this case; it merely defended itself against Gulf Guaranty's court claims" and

7

concluding that "Connecticut General did not waive its right to arbitrate its dispute with Gulf Guaranty"); *see also JPD*, 539 F.3d at 394 (finding that defendant's pre-suit letter disputing plaintiff's allegations and arguing that plaintiff failed to satisfy contractual precondition to arbitrate did not amount to waiver of arbitration rights).

Accordingly, Hunt's motion to compel arbitration is **GRANTED**. (ECF No. 17).

### A. Motion to Stay

The Supreme Court recently clarified that the proper procedure is to stay a filed lawsuit when a trial court compels arbitration: "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 144 S. Ct. 1173, 1178 (2024); accord *Wallace v. Fam. Dollar Stores of Ohio*, LLC, No. 1:23-CV-815, 2024 WL 1605922 (S.D. Ohio Apr. 12, 2024) (citing *Arabian Motors Group W.L.L. v. Ford Motor Co.*, 19 F.4th 938, 941-42 (6th Cir. 2021)). This permits a district court to move the "arbitrable dispute out of court and into arbitration as quickly and easily as possible," facilitating expedient resolution of the parties' disputes. *See Smith*, 144 S. Ct. at 1178 (citing *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)).

Because Hunt requests a stay pending arbitration here (*see* ECF No. 17), this Court **STAYS** the action, including discovery, pending arbitration.

8

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Arbitration (ECF No. 17) and Motion to Stay (ECF No. 24) are hereby **GRANTED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE**

**DATED: March 31, 2025**