IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Quandel Construction Group, Inc., | : | Case No. 2-24-cv-2362 |
| | : | |
| | : | Judge Algenon L. Marbley |
| Plaintiff, | : | |
| | : | Magistrate Judge S. Courter Shimeall |
| v. | : | |
| | : | |
| Hunt Construction Group, Inc., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter comes before this Court on Plaintiff Quandel Construction Group, Inc.'s Motion for Relief from Stay (ECF No. 34) and Defendant Hunt Construction Group, Inc.'s Motion to Amend Response in Opposition (ECF No. 36). For the reasons set forth below, this Court **DENIES** Quandel's Motion for Relief from Stay and **GRANTS** Hunt's Motion to Amend Response in Opposition.

### I.   BACKGROUND

#### A.  Factual Background

This case arises from a business dispute between Plaintiff Quandel, a Pennsylvania limited liability company[1] in the construction business and based in Harrisburg, Pennsylvania, and Defendant Hunt, an Indiana corporation also in the construction business with a principal place of

---

[1] It appears that Quandel formerly had a separate business structure. Its operative Complaint captions its name as "Quandel Construction Group, Inc. n/k/a Quandel Construction Group, LLC." (ECF No. 2 at 1).

business in Los Angeles, California.  (Compl. ¶¶ 1–2, 6, 8).[2]  Quandel also names 10 Doe Defendants, alleged to be employees of Hunt.  (¶ 3).

This dispute's origins begin with a joint venture that the parties entered into in 2013 under Ohio law.  (*See* ECF No. 2-1).  Under the joint venture, Quandel and Hunt would prepare and submit a joint proposal to manage the construction of a hospital for the Mount Carmel Health System in Grove City, Ohio.  (¶¶ 6–8).  The joint venture would be run by a management committee that would make all material decisions.  Quandel and Hunt each had one representative on the committee, and each representative controlled half of the authorized votes.  (¶¶ 9–10).  The joint venture's bid was successful.  Mount Carmel contracted it to construct the hospital, the site, and a medical office building for a guaranteed maximum price of $224,100,000, as well as a garage and "attendant site work elements" for $4,966,930.  (¶¶ 11–14).

The Mount Carmel contract contemplated temporary occupancy of the hospital by August 2018, and temporary occupancy of the medical office building by June 2018.  (¶ 15).  Under it, any party seeking additional compensation or time would have to "provide timely notice of the claim" to the joint venture before it could receive additional time or compensation.  (¶ 29).  But in September 2016, Hunt "unilaterally" signed an amendment to the contract without Quandel's consent that purported to waive any requirements for notice of claims under the contract.  (¶ 30; *see* ECF No. 2-3).  Quandel alleges that this was a breach of the joint venture.  (¶ 31).  According to Quandel, this was just the beginning of Hunt's breaches, which also included Hunt's raids on contingency funds, improper double-billing, and effective extensions of the project without Quandel's knowledge or assent.

---

[2] All references to "Compl." or parenthetical citations to paragraphs "(¶¶ _)" cite to Quandel's operative Complaint (ECF No. 2), unless otherwise stated.

First, following Hunt's unilateral amendment, the project "began to encounter Owner-caused[3] delays, and because of the amendment, Hunt made the decision not to provide concurrent notice to the Owner." (¶ 32).  Instead, Hunt began to raid the contract's contingency fund—funds included outside of the guaranteed maximum price amount to provide for "unforeseen issues that arise." (¶¶ 33, 36).  This was improper, because those funds existed for "unforeseen additional costs," not "claims that could otherwise be passed to another entity." (¶ 34; *see* ¶ 35).  Quandel alleges that this too was a breach of the joint venture, but also directly contravened basic principles of construction management "because, rather than holding the Owner responsible for delay that was unquestionably the Owner's fault, Hunt, on behalf of [the joint venture], unilaterally took that responsibility and agreed to pay for it on behalf of [the joint venture] using the contingency." (¶ 38).  Quandel alleges that at some point prior to August 2018, Hunt "knew that the Project would not be substantially complete" by the deadline, but did not notify Mount Carmel or Quandel. (¶ 39).

Second and separately, as part of the joint venture, Hunt was responsible for providing project executives to oversee construction.  Thus, Hunt managed the finance and accounting of the joint venture. (¶ 40).  According to Quandel, Hunt used its managerial responsibilities to "rotat[e] in project executive personnel" who received *per diem* payments while working on the project that compensated for daily expenses, including meals. (¶¶ 41–42).  Allegedly, these Doe Defendants improperly double-billed by submitting expense reports, including for meals, where the expenses were already covered by the *per diems*. (¶ 43).  Thus, the Doe Defendants received payments for their expense reports from joint venture funds even though those expense reports were for expenses that should have already been covered.  These reports were approved by Hunt employees, and

---

[3] Though the Complaint does not define the term "Owner," it uses the term interchangeably to refer to Mount Carmel. (*E.g.*, ¶¶ 59, 62, 64).

Quandel had no knowledge of them until a Hunt employee who processed expense reports blew the whistle.  (¶¶ 44–45).

Third, *after* the contractual substantial completion date had already elapsed, Hunt executed a charge order that it knew would effectively extend the duration of the project by multiple months that "[s]pecifically stated that it added zero [] days to the Contract Time and maintained the [already-elapsed] substantial completion date."  (¶¶ 49–57).

Due to these issues, substantial completion of the project extended well beyond the substantial completion date.  In early 2019, Hunt began receiving correspondence from Mount Carmel and various subcontractors, alleging claims against the joint venture.  (¶¶ 58–59).  Hunt failed to share that correspondence with Quandel at first, and then sought to resolve claims with Mount Carmel, offering to waive joint venture rights and accept certain liabilities.  (¶¶ 60–62).  Hunt subsequently engaged legal counsel to defend and indemnify Quandel and represent the joint venture on all claims, reaching settlements with Mount Carmel and the construction subcontractors in 2019 and 2020.  (¶¶ 64, 73–78).  Hunt also paid legal fees and settlements for litigation surrounding a Legionella outbreak at Mount Carmel in early 2019.  (¶¶ 79–82).

After the project was completed, the joint venture's mission finished, and all related litigation resolved from Quandel's perspective, Quandel did not hear from Hunt for several years. (¶¶ 84–86). But, in January 2024, Hunt caused the joint venture to issue a capital call, demanding Quandel pay $6.7 million.  (¶ 87).  Quandel rejected the capital call, instead demanding arbitration. (¶¶ 89–90).  The arbitrator sought acknowledgement of the arbitration agreement; Hunt would not provide such acknowledgement, and the arbitrator refused to administrate the suit.  (¶¶ 92–93).

**B.  Procedural History**

Quandel filed the instant suit against Hunt and the ten Doe Defendants on May 10, 2024. (*See* Compl.).  Hunt sought to compel arbitration and stay the proceedings, and this Court granted those requests.  *Quandel Constr. Grp., Inc. v. Hunt Constr. Grp., Inc.*, 2025 WL 963116, at \*4 (S.D. Ohio Mar. 31, 2025) (Marbley, J.) (ECF No. 32).

On July 2, 2025, Quandel filed the instant motion, seeking to proceed with its claims asserted against the Doe Defendants because, as it argued, those claims were distinct from its claims against Hunt.  (ECF No. 34 at 1–2).  Hunt opposed on July 23, 2025, arguing that the stay should remain in place as to all Defendants.  (ECF No. 35 at 1–2).  In its initial memorandum in opposition, Hunt provided two cases—*Vaughn v. Nat'l Collegiate Athletic Ass'n* and *Aerpio Pharms., Inc. v. PhaseBio Pharms., Inc.*—in support of its position.  It argued:

> Even setting aside the agency relationship between Hunt and the Doe Defendants, Quandel's civil theft claim is not severable from its broader contractual dispute with Hunt.  Courts routinely stay litigation involving non-signatories where the claims are inextricably intertwined with claims subject to arbitration. \* \* \* In *Vaughn v. Nat'l Collegiate Athletic Ass'n*, the court granted a stay because "some of the damages sought are the same," and proceeding in two forums would be "an inefficient and duplicative use of time and effort."  No. 1:09-cv-538, 2009 WL 3260382, at \*4 (S.D. Ohio Oct. 8, 2009).  The court also found no prejudice to the plaintiff, who could pursue discovery and remedies in arbitration.  (*Id.*) \* \* \* Here, the rationale of . . . *Vaughn* applies.
>
> \* \* \*
>
> Even if Quandel's claims against the Doe Defendants were not independently arbitrable (though they are), the Court has discretion to stay them pending arbitration of the main dispute. \* \* \* The Southern District followed that approach in *Aerpio Pharms., Inc. v. PhaseBio Pharms., Inc.*, where it stayed non-arbitrable claims that were "inextricably intertwined with the issues that must be arbitrated," warning that parallel proceedings would be "duplicative and risk[ed] inconsistent outcomes."  No. 1:21-cv-00547, 2022 WL 2352364, at \*8–9 (S.D. Ohio June 30, 2022).  The court emphasized that both efficiency and the federal policy favoring arbitration counseled against splitting proceedings where "factual overlap" existed.  That rationale applies here with equal, if not greater, force.  Count V is not only entangled with Quandel's other claims—it is inseparable.  Allowing it to proceed

5

in court would subvert the arbitration agreement and undermine the orderly resolution this Court has already endorsed.

(*Id.* at 5–8).

On July 28, five days after it submitted its opposition memorandum, Hunt filed its Motion for Leave to File a Corrected Opposition Brief, seeking to replace its previous memorandum in opposition, and explaining that its original brief "mistakenly included an incorrect citation and inaccurate placement of quotation marks for the *Aerpio Pharmaceuticals* case on page 7, as well as an error in the citation to *Vaughn*" on page 6. (ECF No. 36 at 1). The *Vaughn* citation error was apparently wrong as to form, though not substance: the proper case name was to this Court's prior decision in *Vaughn v. Marshall*, not *Vaughn v. Nat'l Collegiate Athletic Ass'n*, and although the previously-provided Westlaw citation and substance of the quotation were correct and unchanged, the previously-cited case number[4] was apparently incorrect and unrelated to *Vaughn v. Marshall* or any case involving the National Collegiate Athletic Association.

By contrast, the *Aerpio Pharmaceuticals* case was apparently wrong in both form and substance. First, Hunt provided the wrong case name—meaning to cite *Aerpio Pharms., Inc. v. Quaggin*, 2019 WL 4717477 (S.D. Ohio Sept. 26, 2019), not the (apparently-nonexistent) case *Aerpio Pharms., Inc. v. PhaseBio Pharms., Inc.* It also provided the wrong case number[5] and Westlaw citation.[6] Second, it provided quotations that did not exist in the case. Hunt provided three direct quotes from *Aerpio* in support of its argument that: [1] "the Court has previously stayed non-arbitrable claims that were '*inextricably intertwined with the issues that must be arbitrated*,'" warning that parallel proceedings would be [2] '*duplicative and risk[ed] inconsistent*

---

[4] The case number 1:09-cv-538 cites to the matter *Fair Housing Advocates Assoc. v. NPA Housing Prop., LLC* (S.D. Ohio).

[5] The case number 2:21-cv-547 cites to the matter of *Tucker v. Davol, Inc.* (S.D. Ohio).

[6] 2022 WL 2352364 references a March 30, 2022, decision in *Wolfe v. Affordable Rooter Serv., LLC* (E.D. Ark.). It addresses attorney's fees and has nothing to do with a stay pending arbitration. *See id.* at *1.

*outcomes*,'" and suggesting that the Court "emphasized that both efficiency and the federal policy favoring arbitration counseled against splitting proceedings where '*factual overlap*' existed." (ECF No. 35 at 7) (purported *Aerpio* quotations italicized).  Apparently, however, only two words—"inextricably intertwined"—can actually be found in the actual *Aerpio* case, based on Hunt's amended opposition.  (ECF No. 36-1 at 7–8).  Third, Hunt cited to pages 8 and 9 of the phantom *Aerpio* case, even though those pages in the actual *Aerpio* case excerpt provisions of a consulting agreement discussed in that case, and do not stand for the proposition provided. *Compare Aerpio Pharms., Inc. v. Quaggin*, 2019 WL 4717477, at *8–9 (S.D. Ohio Sept. 26, 2019) (discussing relevant terms of the agreement at issue) *with id.* at *22–23 (finding a stay warranted).

Quandel opposed Hunt's Motion for Leave, arguing that Hunt's prior *Aerpio* reference "was not a simple typographical error in the citation, but what appears to be a typical artificial intelligence ('AI') hallucination" and thus a possible violation of Ohio's Rules of Professional Conduct and the Federal Rules of Civil Procedure.  (ECF No. 39 at 1).  Hunt replied to Quandel's opposition to its motion to amend, (ECF No. 40), and Quandel subsequently replied to Hunt's opposition to its motion for relief.  These motions are now ripe for review.

## II.  LAW AND ANALYSIS

### A.  Preliminary Matters

The Court must address several threshold issues.  First, Hunt's Motion for Leave to File a Corrected Opposition Brief (ECF No. 36) is granted.  Although Quandel "opposes" Hunt's request to correct its brief, Quandel really wants Hunt to provide a more fulsome explanation for its erroneous legal citations.  (*See* ECF No. 39 at 1–3).  Quandel is in full agreement with Hunt that "the record should be corrected"—it just does not find Hunt's fix to be sufficient, arguing that Hunt must fully explain the source of the error before the Court rules on the Motion for Leave.  (*Id.* at

8–9). As a remedy, Quandel argues that Hunt should have to "disclose the entire history of this issue and provide an explanation as to what happened that led to a . . . filing with a case and quotations that do not exist." (*Id.* at 2–3). For its part, Hunt invites the Court to end "this tempest in a teapot" and permit it to file the corrected brief, pointing out that a Westlaw search of federal cases in the Southern District of Ohio for "Aerpio" returns two cases, including the correct *Aerpio* case. (ECF No. 40 at 1–2).

The Court agrees with Quandel that Hunt must provide further explanation as to how it submitted two incorrect legal citations in its briefing, *see* Section II(C), *infra*, but that is a separate issue as to whether Hunt should be able to correct the substance of its memorandum. To Quandel's credit, it promptly discovered this improper citation and brought it to Hunt's attention. To Hunt's credit, it promptly sought to correct its filing. Allowing Hunt to correct its briefing will ensure that this Court's decision on Quandel's Motion for Relief from Stay properly addresses the merits of the parties' dispute. So, Hunt's Motion to Amend Response in Opposition is **GRANTED**.

Second, the Court *sua sponte* raises the issue of required corporate disclosure statements. This case is premised on diversity jurisdiction under 28 U.S.C. § 1332. (¶ 4).[7] In cases "in which jurisdiction is based on diversity," parties must "name—and identify the citizenship of—every individual or entity whose citizenship is attributed to that party." Fed. R. Civ. P. 7.1(a)(2); *see* S.D. Ohio Civ. R. 7.1.1(c)(3) ("Parties required to file disclosure statements *shall* do so with their first appearance, pleading, motion, response, or other filing with the Court.") (emphasis added). To date, neither party has filed the required corporate disclosure statements. This is especially concerning because, despite the misleading case name, Quandel is a *limited liability company*.

---

[7] In its Complaint, Quandel also references *Quandel Constr. Grp., Inc. v. Hunt Constr. Grp., Inc.*, No. 2:24-cv-1899. (¶ 5). In that case, Hunt removed the matter from the Franklin County Court of Common Pleas to federal court on the basis of diversity jurisdiction. (ECF No. 1 ¶ 8, No. 2:24-cv-1899).

(¶ 1 ("Quandel is a Pennsylvania Limited Liability Company with its principal place of business near Harrisburg, Pennsylvania.")); *see* n.1, *supra*. Whenever diversity jurisdiction is invoked and a limited liability company is a party, as a threshold matter, "the court needs to know the citizenship of each member of the company." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2005). "And because a member of a limited liability company may itself have multiple members—and thus may itself have multiple citizenships—the federal court needs to know the citizenship of each 'sub-member' as well." *Id.* (emphasis added).

At present, this Court has no information about the citizenship of Quandel. Because it is a limited liability company, Quandel's principal place of business is of no moment for diversity jurisdiction—what matters is the citizenship of each of its members. *Cardinal Health 110, LLC v. Talla*, 2025 WL 1373316, at *1 (S.D. Ohio Mar. 31, 2025). If any of those members of Quandel are themselves limited liability companies, the same citizenship inquiry continues for them, because the citizenship of *all* of a member LLC's submembers would in turn be attributed to Quandel. *See Scarlet Club, LLC v. Point on Lane Partners, LLC*, 2025 WL 3004929, at *1–2 (S.D. Ohio Oct. 27, 2025) (Marbley, J.). Thus, the parties are **ORDERED** to file complete Rule 7.1 disclosure statements within seven days of the date of this opinion.

### B.  Motion for Relief from Stay

This Court previously granted Hunt's request to compel arbitration and stay proceedings, determining that the dispute was governed by an arbitration agreement. *Quandel Constr. Grp., Inc. v. Hunt Constr. Grp., Inc.*, 2025 WL 963116, at *2, *4 (S.D. Ohio Mar. 31, 2025) (Marbley, J.) (ECF No. 32); *see* 9 U.S.C. §§ 2–4. Now, Quandel requests relief from this Court's stay of the proceedings insofar as it brings claims against the Doe Defendants, arguing that they were not

signatories to any contract containing an arbitration provision and that the claims that it levies against them are distinct from the claims against Hunt.  (ECF No. 34 at 1–2, 5–6).

Quandel's motion fails for two reasons.  First, Quandel's claims against the Doe Defendants are at least inextricably intertwined with its claims against Hunt.  Separately, it falls flat because its Complaint does not seek any relief from the Doe Defendants.  The Court considers each issue in turn.

Quandel's motion to lift the stay against the Doe Defendants fails because Quandel's case against the Doe Defendants is intertwined with its case against Hunt.  Courts have "discretion to stay claims against nonsignatories pending the outcome of arbitration between the parties to an arbitration agreement."  *Patnik v. Citicorp Bank Tr. FSB*, 412 F. Supp. 2d 753, 762 (N.D. Ohio 2005).  Such a stay "is justified when a lawsuit against a nonsignatory depends upon the same facts and is inherently inseparable from the arbitrable claims."  *Id.*

Quandel argues that its claims against the Doe Defendants are "separate and distinct" from its claims against Hunt, and that since the Doe Defendants are not signatories to the joint venture agreement, they have no basis to invoke its arbitration provision.  (ECF Nos. 34 at 2, 5–6; 41 at 4–5).  It casts its claims against the Doe Defendants as arising out of "independent actions," because its claims against Hunt stem from Hunt's alleged breach of contract and fiduciary duty pursuant to the joint venture, whereas the claims against the Doe Defendants arise "on behalf of the Joint Venture" for the alleged double-billing.  (*Id.* at 7–8) (emphasis altered).  Quandel further argues that Hunt has taken inconsistent positions regarding the status of the Doe Defendants in its Answer to the Complaint as compared to its opposition to Quandel's motion, variously asserting that the Doe Defendants are or are not Hunt employees.  (*Id.* at 6–8) (citing ECF No. 25).

10

Hunt counters that Quandel's suit against the Doe Defendants should be stayed, in part because it falls within the scope of the arbitration agreement, or alternatively because the claims against the Doe Defendants are factually indistinguishable from the claims against Hunt. (ECF No. 36-1 at 1–2, 3–8).

Quandel's arguments are unavailing. First, Quandel interprets Hunt's Answer—and its broad denials of Complaint allegations—too narrowly. Quandel cherry-picks specific lines of its Complaint to suggest that Hunt has denied that the Doe Defendants were its employees, but in reality, Hunt appears to have denied the substance of broader allegations as a whole. Indeed, Hunt indicated that it did not know who the Doe Defendants were, and thus "lack[ed] knowledge to admit or deny the allegations about the Doe Defendants." (ECF No. 25 ¶ 44). Moreover, Quandel's theory of liability against the Doe Defendants is that they "improperly double billed for expenses by submitting Expense Reports for costs already covered by the *per diem* payments," and thus *Hunt* sought to "force Quandel to expend funds to cover the money that the Doe Defendants . . . stole in the first instance." (¶¶ 126, 129–30; *see id.* ¶¶ 42–48). These allegations are quintessentially related to Quandel's allegations against Hunt, however Quandel might try to reframe its Complaint. This Court's decision in *Vaughn v. Marshall* is instructive. *See Vaughn v. Marshall*, 2009 WL 3260382, at *4 (S.D. Ohio Oct. 8, 2009) (Marbley, J.).

In *Vaughn*, the arbitrable and non-arbitrable issues were both related to the interpretation of the operative agreement. *Id.* Thus, this Court determined that because the claims were "intertwined, . . . and because some of the damages sought [were] the same, it would be an inefficient and duplicative use of time and effort for this Court and the litigants if the parties [were] required to proceed in two forums at once." *Id.* (finding a stay necessary to avoid inefficiency and inconvenience to the Court and the litigants, and to avoid the risk of inconsistent results); *accord*

11

*Geo Vantage of Ohio, LLC v. GeoVantage, Inc.*, 2006 WL 2583379, at \*12 (S.D. Ohio Sept. 6, 2006). The same can be said here, because whether the actions of the Doe Defendants were impermissible may turn on the contours of the joint venture agreement.

There is a separate reason for denying Quandel's motion. Quandel's request to resume litigation against the Doe Defendants does not comport with its theory of the case as laid out in the Complaint. Quandel brings five counts against the Defendants. Counts 1–4, which seek declaratory relief, as well as damages for breach of fiduciary duty and contract, only discuss or reference Hunt. (¶¶ 99–123). In contrast, Count 5 does reference the alleged theft of the Doe Defendants, while again discussing Hunt's alleged role. (¶¶ 124–32). Crucially, however, *Quandel's prayer for relief only seeks relief against Hunt*—including damages for the alleged actions of the Doe Defendants covered by Count 5. (Compl. at 17). Even assuming Quandel's claims against the Doe Defendants "are separate and distinct from its claims against Hunt," (ECF No. 34 at 2), Quandel's Complaint only seeks "judgment against Hunt" on the basis of the alleged "Doe Defendants' theft." (Compl. at 17; *see id.* ¶¶ 124–32).

Quandel fails to plead any claim against the Doe Defendants that could stand alone. *See generally Adams v. A E Door & Windows*, 2018 WL 1322240, at \*2–3 (S.D. Ohio Mar. 13, 2018) (dismissing complaint that failed to identify relief sought). This is because Quandel has not sought relief from any of the Doe Defendants. *See* Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain: . . . a demand for the relief sought."). Quandel has only sought relief from Hunt.[8] Quandel could not gain anything in this matter from proceeding against the Doe Defendants under its operative pleadings, and this Court will not permit it to now proceed against the Doe

---

[8] In its reply in support of its motion, Quandel "proposes that it shall file an amended complaint to clearly delineate the two independent actions," though it suggests that an amended complaint "is not required at this stage." (ECF No. 41 at 5).

Defendants individually after this Court has stayed the case to effectuate its arbitration agreement with Hunt.  *See Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975) (per curiam) (noting that courts have no duty to "create" claims not spelled out in the pleadings).

Consistent with this Court's inherent power to control its docket, and in the interests of judicial economy, convenience, and to avoid the risk of inconsistent results, this case remains stayed as to all defendants.  *Aerpio Pharms., Inc. v. Quaggin*, 2019 WL 4717477, at *22 (S.D. Ohio Sept. 26, 2019) ("[A] discretionary stay is necessitated by the close relationship between the parties and the claims, the similar factual allegations underlying the claims, and the possibility of inconsistent results if arbitration and this litigation were to proceed at the same time."), *report and recommendation adopted*, 2019 WL 5455111 (S.D. Ohio Oct. 24, 2019); *see Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (entry of a stay rests within the sound discretion of the district court).  Quandel's Motion for Relief from Stay is **DENIED**.

### C.  Counsel Declarations

Having addressed the merits of Quandel's Motion for Relief, the Court returns to Quandel's request for further explanation regarding Hunt's erroneous citations.  Quandel hypothesizes that Hunt's erroneous legal citations resulted from an AI hallucination, suggesting Hunt's counsel may have violated Ohio's Rules of Professional Conduct and the Federal Rules of Civil Procedure. (ECF No. 39 at 1–2).  Hunt asserts that the "accusation that Hunt used AI to do legal research is false," argues that the substance of its erroneous *Aerpio* citation is the same as the substance of the

real case, and points out that its revisions merely correct the case name, citation, and alter the quotations. (ECF No. 40 at 1–2).

It does not appear that artificial intelligence was the culprit for Hunt's erroneous citations to legal authority, at least based on the representations of Hunt's counsel. (*See id.*). At the same time, Hunt's briefing has thus far failed to clarify how or why it provided the Court with two incorrect case names, two incorrect case citations, and improper direct quotations from one of those incorrect case citations. With each filing, attorneys represent to the Court that their "legal contentions" are, "to the best of [their] knowledge, information, and belief," "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). This is true regardless of whether an attorney utilizes artificial intelligence in crafting legal contentions. As the Supreme Court explained, under Rule 11, an attorney's "signature certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991). This places an "affirmative duty" on counsel "to investigate . . . the law prior to the subscription and submission of any pleading, motion or paper." *Id.* at 545 (citation and internal quotation marks omitted); *see Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) (filing "motions without taking the necessary care in their preparation is [an] abuse of the judicial system").

Our legal system only functions when attorneys adhere to their professional and ethical obligations. These obligations go beyond their responsibilities to their clients, and include their duties to the Court. The judiciary must be able to rely on the representations and submissions of attorneys who appear before it, because courts "rely on the parties to frame the issues for decision."

14

*Whiting v. City of Athens*, _ F.4th __, 2026 WL 710568, at *3 (6th Cir. Mar. 13, 2026) (citation omitted).  Hunt's briefing provided this Court with nonexistent case citations and purported to quote nonexistent case language; Hunt's representation that artificial intelligence was *not* the cause of these errors is not an explanation sufficient to address how these errors actually happened. Though the Court takes counsel for Hunt at their word if they say that artificial intelligence was not involved in their legal research, that does not end the inquiry.  The topical worry that artificial intelligence will lure attorneys with the false siren song of easy shortcuts to legal authority is part of a much larger concern that attorneys will fail to cite their sources properly and—either intentionally or unintentionally—mislead the Court.

Whether artificial intelligence was used, false citations damage judicial proceedings: "[t]he opposing party expends resources identifying and exposing the fabrications; the court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed; and public confidence about the trustworthiness of legal proceedings may be diminished." *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1257 (N.D. Ala. 2025); *accord Oneto v. Watson*, 808 F. Supp. 3d 974, 980 (N.D. Cal. 2025) (noting that sanctions may be appropriate for submitting fictitious case citations, quotations, or related misrepresentations "regardless of whether generative AI suggested the content").  No court filing "'should contain *any* citations—whether provided by generative AI or any other source—that' a lawyer has not personally 'read and verified.'"  *Whiting*, 2026 WL 710568, at *4 (citation omitted; emphasis in original).  Hunt's submission necessitates further inquiry.  *Cf. Buckley v. Valeo*, 424 U.S. 1, 67 (1976) ("Publicity is justly commended as a remedy[.] . . .  Sunlight is said to the best of disinfectants.").  Hunt's attorneys must provide a full explanation, consistent with their obligations to the tribunal.

15

Hunt is represented by at least three attorneys. Mr. Peter W. Hahn of Taft Stettinius & Hollister LLP is the only signatory—and the only counsel listed—on Hunt's filing at issue. (*See* ECF No. 35 at 10). Mr. Michael Shannon McNamara and Ms. Sarah Stehle of Pillsbury Winthrop Shaw Pittman LLP have also appeared on behalf of Hunt in this matter *pro hac vice*. (ECF Nos. 12–15). Mr. Hahn, Mr. McNamara, and Ms. Stehle are **ORDERED** to submit individual sworn submissions explaining to the Court their role in researching, drafting, or otherwise cite-checking or preparing Hunt's initial opposition memorandum. (ECF No. 35). Each individual's sworn submission **SHALL** address: (1) the names of all attorneys at the law firms of Taft Stettinius & Hollister LLP and Pillsbury Winthrop Shaw Pittman LLP who were responsible for the legal research, drafting, and/or cite-checking of that opposition memorandum; (2) the swearing individual's knowledge regarding the cause or causes of the errors in the *Aerpio* and *Vaughn* citations; and (3) whether the individual has used any artificial intelligence tool in connection with that opposition memorandum or this matter. These individual sworn submissions are due within fourteen days of the date of this opinion.

### III.    CONCLUSION

For the foregoing reasons, Hunt's Motion to Amend Response in Opposition (ECF No. 36) is **GRANTED**, and Plaintiff Quandel's Motion for Relief from Stay (ECF No. 34) is **DENIED**. This matter remains stayed. The parties are **ORDERED** to file Rule 7.1 disclosure statements within seven days of the date of this opinion. Furthermore, Hunt's attorneys are **ORDERED** to submit individual sworn statements addressing their roles in preparing Hunt's initial opposition memorandum (ECF No. 35) within fourteen days of the date of this opinion.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**DATED:  March 31, 2026**          **UNITED STATES DISTRICT JUDGE**